BRUCE G. PERSSON and ELIZABETH M. PERSSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; JAMES D. WOOD, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Persson v. Commissioner
Docket Nos. 6472-86, 41889-86.
United States Tax Court
T.C. Memo 1989-567; 1989 Tax Ct. Memo LEXIS 580; 58 T.C.M. (CCH) 409; T.C.M. (RIA) 89567; October 19, 1989. Leslie M. Apple and Richard E. Honen, for the petitioners. Robert E. Marum and Nancy M. Vinocur, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: These consolidated cases [1] were assigned to Special Trial Judge D. Irvin Couvillion pursuant to the provisions of section 7443A(b) of the Internal Revenue Code of 1986 and Rule 180 et seq. [2] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. *587 OPINION OF THE SPECIAL TRIAL JUDGE COUVILLION, Special Trial Judge: Respondent determined the following deficiencies in, and additions to, petitioners' Federal income taxes for the years shown: Additions to Tax
Section
Section
Section
Section
Petitioner
Year
Deficiency
6651(a)(1)
6653(a)(1)
6653(a)(2)
6659(a)
Bruce G. &
1981
$7,449.00
$372.45
*
$2,234.70
Elizabeth M.
1982
$8,799.66
$439.98
*
$2,639.90
Persson
1983
$9,535.00
$476.75
*
$2,860.50
#6472-86
James D.
1981
$4,996.70
$1,127.17
$249.83
*
$1,449.01
Wood
1982
$7,161.55
$358.08
*
$2,148.46
#41889-86
Respondent also determined that all underpayments in tax for each year constituted substantial underpayments attributable to tax-motivated transactions under section 6621(c) (formerly section 6621(d)). [3]
At trial, respondent moved *588 to amend the Answers to increase the deficiencies and additions to tax to the following amounts: Additions to Tax
Section
Section
Section
Petitioner
Year
Deficiency
6653(a)(1)
6653(a)(2)
6659(a)
Bruce G. & Elizabeth
1982 $26,569.00
$1,328.00
*
$ 7,971.00
M. Persson; #6472-86
1983 $35,779.00
$1,789.00
*
$10,734.00
James D. Wood
1982 $13,312.00
$ 660.00
*
$ 3,994.00
#41889-86
The issues for decision are: (1) Whether the statute of limitations bars the assessment and collection of taxes for any of the years in question; (2) whether transactions purportedly conveying interests to petitioners in a registered Holstein bull were so lacking in economic substance that the transactions should not be recognized for Federal income tax purposes; (3) whether the benefits and burdens of ownership were transferred to petitioners in their purported purchase of undivided interests in the bull; (4) the value of the bull on December 1, 1981; and, in the event the foregoing questions are resolved *589 in favor of petitioners, the following other issues, each in the alternative to the other: (5) whether petitioners' activity in connection with the bull constituted an activity not engaged in for profit under section 183; (6) whether promissory notes executed by petitioners for their interests in the bull were so contingent that the notes should not be included in petitioners' cost for purposes of depreciation and the investment tax credit; (7) whether petitioners were "at risk" under section 465; and (8) whether petitioners correctly reported all income attributable to their interests in the bull for 1982 and 1983. The final issues are the additions to tax and the increased rate of interest for underpayments of tax attributable to tax motivated transactions. In the case of James D. Wood (Wood), the parties reached a basis for settlement at trial with respect to another bull purchased by him during 1982: That Wood was not entitled to an investment tax credit of $83; that he was not entitled to additional first-year depreciation of $5,000 under section 179; that he was not entitled to depreciation of $5,505 under section 167; and that Wood was entitled to an ordinary loss of $850 *590 with respect to this bull. Wood conceded that the underpayment of tax resulting therefrom was attributable to a tax motivated transaction under section 6621(c); respondent conceded that the transaction with respect to this bull did not constitute negligence or intentional disregard of rules or regulations for purposes of section 6653(a)(1) and 6653(a)(2), and that the underpayment of tax therefrom was not attributable to a valuation overstatement under section 6659. No concessions were effected in the case of Bruce G. and Elizabeth M. Persson; however, an adjustment to medical expenses for 1983 is a technical adjustment resulting from the other adjustments at issue. FINDINGS OF FACT Some of the facts were stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. [4]
*591 Petitioners Bruce G. and Elizabeth M. Persson, husband and wife, resided at Westlake Village, California, at the time they filed their petition. They filed joint Federal income tax returns for the years 1981, 1982, and 1983. Petitioner James D. Wood resided at Walton, New York, at the time he filed his petition. He filed his 1981 and 1982 Federal income tax returns as a single individual. In 1981, Wood informed Bruce G. Persson (Persson) of an opportunity to purchase interests in a Holstein bull, Dreamstreet Prophet (Prophet) which was being offered for sale by Dreamstreet Holsteins, Inc. (Dreamstreet) of Walton, New York. At the time, Persson resided at Walton, where he owned and operated the Loft Restaurant. Dreamstreet officers and employees, including its President, Francis W. Wood, often dined at Persson's restaurant. On his income tax returns for the years at issue, Persson listed his occupation as a farmer. Several years prior thereto, Persson had purchased a 275-acre farm at Walton on which he initially commenced raising White-faced Hereford cattle. After realizing that Herefords were not highly profitable, he decided to venture into Holstein cattle breeding. He *592 contacted the New York State Holstein Association, where he was advised to consult a knowledgeable dairyman regarding Holsteins. Persson and the dairyman he initially hired visited other farms in the Walton area but were unable to find the caliber of cattle he desired to breed. In 1977, Persson hired Carl Hulbert, who was knowledgeable in Holsteins, and the two purchased Holsteins during 1977 and 1978. The farm, operated under the name "Catskill Dairy Farm," earned a reputation for producing high quality animals. The farm exhibited its animals in local fairs and trade shows and won its share of awards. The farm was advertised in local newspapers as well as in magazines which circulated within the Holstein industry. Although Persson later sold his entire herd and went out of the Holstein business, he retained his farm. Persson had been actively engaged in the operation of his farm. He was licensed to perform artificial insemination (A.I.) of cattle and performed this service on his farm. At the time of trial, Persson was engaged in the real estate business in California. Wood was the brother of Francis W. Wood, President and Chief Executive Officer of Dreamstreet. Wood earned *593 an accounting degree from the State University of New York at Binghamton in 1977 and a law degree from the Albany Law School of Union University in 1980. In the fall of 1980 and until March or April of 1981, Wood was an attorney for W & J Farm Services, Inc. (W & J). In March or April of 1981, he entered into private law practice in Walton and shared law office space with Judge Robert L. Estes (Estes) and Terrence P. O'Leary (O'Leary). Wood's legal practice consisted primarily of representing Dreamstreet and West Brook Holsteins, Inc. (West Brook). He kept abreast of current developments in the Holstein industry, he attended cattle shows and auctions regularly, became familiar with pedigrees, read trade journals, became versed in sales information, and developed contacts with people in the industry outside of Dreamstreet. In early 1983, Wood began working primarily out of his home or out of the Dreamstreet office, and most of his practice was related to Dreamstreet. In the fall of 1985, he began part-time work with a law firm in Albany, New York, and joined that firm in January 1987. As a result of his work in this area, Wood became interested in acquiring an interest in cattle. *594 The bull Prophet, which is the subject of this litigation, was his first acquisition. Francis W. Wood grew up in the Catskill Mountains of upstate New York on a small dairy farm where he raised his own dairy cattle. He bred and exhibited cows and was active in the local 4-H Club while in grade school. He attended Rensselaer Polytechnic Institute at Troy, New York, and graduated from Albany Law School of Union University in 1973. After law school, he was in private law practice at Albany, New York, until 1979. While in private practice, Francis W. Wood represented George B. Morgan and George Teichner, two individuals who owned W & J. He also represented Chase Manhattan Bank, which had various loan programs for businesses with agricultural pursuits. In addition to his work as an attorney, Francis W. Wood was a student of Holstein-Freisian dairy cattle, became knowledgeable in pedigrees and in methods of breeding such cattle. He was a member of the Holstein-Freisian Association of America, the New York State Holstein Association, and numerous other dairy and beef cattle associations. He subscribed to various magazines and trade journals devoted to Holstein cattle. He wrote "A *595 Workbook Manual for Breeding Better Dairy Cattle" in 1971, which provided guidance to farmers in breeding their herds in a simple, organized, and correct manner. The book was reviewed and endorsed by two different breeders and a Cornell University professor. It was advertised in the Holstein World in its "Breeder's Book Shelf." Holstein World is a national magazine, published monthly, which has been in existence for some 85 years. As its name implies, the magazine is devoted to publishing news articles and features regarding the Holstein cattle industry. Its readers are primarily Holstein owners and breeders. The magazine is independent of the Holstein-Freisian Breeders Association. In August 1979, Francis W. Wood became the sole owner of Dreamstreet, which he founded with George B. Morgan in February 1979. Dreamstreet engaged in all facets of dairy cattle breeding, including the acquisition and mating of cattle, the birth and raising of calves, and the merchandising of calves and genetic products, the latter of which included frozen semen and embryos. In 1979, Francis W. Wood formed West Brook and owned all of its stock. West Brook provided or arranged for the care and management *596 of high quality cattle, including the collection and marketing of semen. In 1983, Francis W. Wood formed Dreamstreet Sires International, Inc. (Sires), which previously had been an unincorporated division of West Brook. Francis W. Wood owned 80 percent of Sires and Meir Brown, another individual, owned 20 percent. Sires undertook the activity formerly performed by West Brook in collecting, marketing, and distributing semen of bulls bred and developed by Dreamstreet as well as bulls owned by others. Sires employed 140 salesmen who traveled across the country selling semen directly to farmers. The salesmen were generally paid on a commission basis. In 1985, Sires was merged into University Genetics, Inc. of Westport, Connecticut (University). Francis W. Wood originally owned two percent of University, which he subsequently sold. Also, in 1985, Dreamstreet formed Dreamstreet Holsteins, Ltd., a wholly-owned Canadian subsidiary, based in Ontario, Canada. Dreamstreet, West Brook, and Sires were operated as separate entities. Each company had a separate function, staff, checking account, stationery, and office. There was, however, some sharing of computer services. All three *597 companies were located at Walton, New York. Sometime prior to January 1987, Dreamstreet and West Brook merged, with West Brook being the surviving entity. In January 1987, West Brook and all other Dreamstreet-related entities merged and the surviving entity became Dreamstreet Holsteins, Inc. At the time of trial, Dreamstreet was one of the largest registered Holstein cattle businesses in the world. It was licensed as a cattle dealer in the State of New York and with the United States Packers and Stockyards Administration. It had an active international export business and was recognized in the Holstein industry as a world leader in the breeding, management, and marketing of Holstein dairy cattle. Dreamstreet bred high-level, high-quality cattle; it managed many of the highest classified cattle in the world and was well-recognized in the industry. Francis W. Wood's reputation in the registered Holstein industry was considered excellent. He was named in two Holstein books as one of the 50 best breeders in the registered Holstein industry. Several witnesses, including Professor Samuel T. Slack (Slack), Professor Emeritus, Department of Agriculture and Life Sciences, at Cornell *598 University, characterized him as a leader and expert in the registered Holstein business. The Holstein-Freisian breed of dairy cattle was first introduced in the United States in the late 1800s, and careful specialized breeding of Holsteins began in the mid-1800s. In approximately 1890, Holsteins became the most popular dairy breed in the United States. The United States Holstein is the most profitable of all the international Holstein breeds and accounts for 94 percent of some ten million dairy cows in the United States. Holsteins have tremendous capacity for producing milk, butterfat, and income over feed costs. Holsteins have international appeal because cows that produce large volumes of milk with a high percentage of butterfat are in demand. To maximize profits, dairy farmers seek cows which produce a large quantity of milk, high in butterfat with a combination of strong bloodlines. Of the ten million dairy cows in the United States, one million are registered Holsteins. The Holstein-Freisian Association of America annually presents its most coveted prize, the Gold Medal Dam award, to superior cows. To qualify as a Gold Medal Dam, a cow must have three or more offspring *599 which are genetically superior to other animals in the breed. This means that the offspring must be in the top 30 percent of the breed. In 1985, 270 cows qualified for the award, approximately three one-hundredths of one percent of the one million registered Holstein cows. In 1986, 367 cows qualified as Gold Medal Dams in the United States. Prophet, the bull at issue in this case, was born January 8, 1981. His father (sire) was Paclamar Bootmaker (Bootmaker) and his mother (dam) was Fair Hill Roe Cassy (Cassy). Cassy was owned by Dreamstreet. Prophet was purebred Holstein and had one of the best pedigrees for a Holstein bull ever assembled in the United States. His dam, Cassy, was a Gold Medal Dam. His grandmother (second dam) and great grandmother (third dam) on his maternal side were also Gold Medal Dams. Of the 637 cows qualifying as Gold Medal Dams in 1985 and 1986, less than 100 came from Gold Medal Dam status, and fewer than ten Holstein animals in the United States came from three generations of Gold Medal Dams. As of 1987, Prophet's classification was scored Excellent - 90 points, on a scale of 0 to 100. His dam had scored Excellent - 95 points, his second dam had *600 scored Excellent - 90 points, his third dam had scored Excellent - 90 points, and his fourth dam had also scored Excellent - 90 points. According to expert testimony at trial, there was not another bull alive in the United States from four generations of Excellent dams. Prophet's sire, Bootmaker, was one of the most highly regarded sires in the Holstein breed at the time Prophet was born. As of 1984, Bootmaker had sired more Gold Medal daughters than any other bull in the history of the breed. According to experts, Prophet had as good a pedigree as any other bull born in 1981. The principal objective in owning a bull such as Prophet was to sell its semen. Once a bull becomes "proven," the market for the sale of such bull's semen is considerably enhanced and the bull appreciates in value. It takes at least five years to "prove" a bull. Essentially, "proof" is measured by the milk production capacities of the bull's daughters and is based on certain standards of the United States Department of Agriculture (USDA). The elements of proof are milk and butterfat production, protein, and classification or type. Attaining a positive in one or more of these elements determines the relative *601 marketability of a bull's semen. A bull's proof is compiled and published in a "Red Book," which circulates within the Holstein industry. Until proof of a bull is obtained, it is difficult to sell its semen. Heavy advertising and marketing of the bull and its pedigree, commencing at an early age, are necessary to achieve any degree of success. Prophet was highly promoted soon after his birth in the hope that large quantities of his semen could be sold early on in order that a proof could be established. Dreamstreet announced Prophet's birth in an eight-page "double-gatefold," a folded insert, in the April 1981 Holstein World. In the June 1981 Holstein World, Dreamstreet placed a six-page single-gatefold advertisement including a full page which functioned as an obituary for Cassy, Prophet's dam, who died six weeks after Prophet's birth. The advertisement prominently mentioned Prophet as possibly "the best male to ever carry the Dreamstreet prefix." Dreamstreet placed several other advertisements in issues of Holstein World and issued calendars inserted in issues of Holstein World displaying pictures of Prophet. In addition, Dreamstreet's advertisements in Holstein World utilized *602 "four-color" advertising, which cost approximately three times as much as single color advertisements. Hugh Sutherland (Sutherland), Executive Secretary of the New York State Holstein Association, testified he was aware of the promotion and advertising of Prophet through Holstein World. He also testified that the entire Dreamstreet operation was outstanding and had set a standard which was a challenge to other breeders. R. Peter Heffering (Heffering), an expert for petitioners, characterized the eight-page double-gatefold advertisement announcing Prophet's birth as one of the biggest advertisements of that nature. He noted that the advertisements would encourage farmers and breeders to purchase Prophet's semen, even though semen from Prophet was not then available. Petitioners began to discuss the purchase of Prophet from Dreamstreet in the Fall of 1981. Although the bull was less than a year old at the time, this was the customary age for an animal of this nature to be sold. On December 1, 1981, Wood purchased an undivided one-sixth interest in Prophet for $66,700 and on the same date, Persson purchased an undivided one-half interest for $200,000. Two other one-sixth interests *603 in Prophet were purchased by Estes and O'Leary for $66,700 each. Separate, but identical, documents were executed as to each purchaser and consisted of a Sales Agreement, a Promissory Note, a Security Agreement, and a Dairy Cattle Maintenance Agreement (the maintenance agreements). Although the documents were executed in March 1982, the documents recited they were effective December 1, 1981. The Sales Agreements provided that the Buyer (Wood or Persson) agreed to buy and the Seller (Dreamstreet) agreed to sell "an interest in the Holstein-Freisian bull," identified on an attached schedule as Dreamstreet Prophet. The following warranties were in each Sales Agreement: 2. The aforesaid bull is represented and warranted to be purebred Holstein-Friesian, capable of being registered with the Holstein-Friesian Association of America. 3. Seller warrants and represents that all of the cattle are breeders, that they are fertile and when mated to an animal of the opposite sex, known to be fertile, will produce a pregnancy within four (4) months after attaining suitable breeding age. Seller further warrants and represents that each of the cattle shall produce, after such time as each *604 of the cattle shall attain suitable breeding age and until such time as each of such cattle shall attain the age of twenty-four (24) months, an average of five hundred ampules of semen per week, such semen to be of sufficient quality so as to render such cattle suitable for use in an artificial insemination program. Seller will, at its sole cost and expense, replace any animal which shall prove to be a non-breeder on or before said date or which shall not produce semen in the quantity or of the quality warranted, with an animal of approximately the same age, quality and value originally represented with respect to the animal which fails to satisfy the aforementioned warranties, such replacement animal to be acceptable to Buyer. Each replacement animal will be covered by the same aforementioned warranties for non-breeder status for a term of twenty-four (24) months from the date of replacement. As recited in the Sales Agreements, Wood executed a promissory note in the amount of $66,700 and Persson executed a note in the amount of $200,000 in payment for their respective interests in Prophet. Wood's note provided for principal payments of $1,000 on the date of execution and $2,500 *605 on March 15, 1982. Persson's note provided for principal payments of $1,000 on the date of execution and $9,000 on March 15, 1982. The notes bore interest at nine percent per annum. With respect to further payments, each note simply provided: "All subsequent payment of principal and interest shall be made from the sale of semen from the maker's herd of cattle on the dates hereof, but in no event later than December 31, 1988." Persson paid the $1,000 principal payment on December 31, 1981, and the $9,000 principal payment on April 1, 1982; Wood, however, failed to pay the two payments called for in his note. There was no language stating that either note was of a limited or nonrecourse nature. The Security Agreements named Dreamstreet as the secured party and Prophet and semen as the collateral. The Security Agreements secured payment of each note. Each Security Agreement provided that Prophet would be kept in the State of New York or anywhere else mutually agreed upon by Dreamstreet and his owners. The Security Agreements further provided that "debtor shall, upon request of the Secured Party, permit the Collateral to be registered in the name of the Secured Party as Nominee *606 for Debtor." The maintenance agreements were between petitioners and West Brook. These agreements provided that, in general, West Brook would provide all services which typically would be required of a herdsman. This included the development, maintenance, and promotion of the bull. More specifically, this included the transportation, feeding, health care, and maintenance of the bull and the collection, freezing, promotion, distribution, and marketing of semen such that at least 200 Holstein cows would be bred. The agreements also provided: B. Payment of Operation Expenses. During the term of this Agreement, WBH (West Brook) shall pay all reasonable operating expenses in connection with the care and maintenance of the bull from the proceeds of sales of semen from the Herd, and shall be entitled to receive as consideration for its services, a commission of 35% of the amount of proceeds received from such semen sales, after such operating expenses are first paid therefrom. Operating expenses shall include specifically, but not be limited to, the reasonable cost of all feed, grain, roughage and fodder consumed by the original cattle, replacements thereof, necessary labor, shelter, *607 use of barns, pastures, exercise areas, veterinary expenses, semen collection and freezing expenses. WBH (West Brook) shall have no authority to incur any expenses on behalf of (Wood) (Persson) for which (Wood) (Persson) shall have personal liability without first obtaining (Wood's) (Persson's) written consent, but may incur such expenses to be paid solely from proceeds of future semen sales. Additionally, the agreements required West Brook to: Render written request (sic) of its activities, at the end of each calendar quarter, setting forth the revenues from sale of semen, operating expenses, commissions, credits to Dreamstreet Holsteins and such other pertinent information as (Wood) (Persson) shall from time to time require. Prophet was tested or sampled for semen sometime prior to December 1, 1981, and it was determined his semen was suitable for use in A.I. It was also determined that Prophet would adapt or conform to the semen collection process, a procedure that some bulls would not adapt to. The proving period begins after a bull comes into service, normally at the age of 12 to 15 months. During the proving period, the bull is mated to no less than 150 to 200 cows *608 in order to generate at least 75 daughters. After at least 75 daughters produce milk, their milk production and performance are recorded, and the results determine whether the bull attains positive proof in one or more of the elements previously described. The goal is to produce reliable information on the bull's daughters. The more daughters, the more reliable the information. The objective of the owner is to get the bull proved and to do so as soon as possible. It is common for breeders to give semen away to farmers. The semen of some bulls is easier to distribute than others. If a bull's sire or dam, or either, are nationally prominent, the bull's owner may be able to charge a realistic fee for the semen to offset the proving costs. The next step in the proving process is the lactation period, which is a period of at least 305 days in which the bull's daughters produce milk. If a lactation period of less than 305 days is used, that result must be factored pursuant to a USDA formula, and the resulting "projected information" is less reliable than information obtained from a full lactation. The USDA reliability figures also factor in the number of daughters and the number *609 of herds involved, in order to reduce management influence as compared with inherited influence. The proving process for a bull takes several years. From the time the bull is mated, it takes nine months for the birth of the calf. It takes two years for the daughter to reach breeding age, therefore, it takes at least three to three and one-half years before information on the daughter is available. A bull can be five years old before it has any official production performance information. In addition, many young sires must compete for mates during the proving process. Therefore, it is a challenge to get a bull sampled at an early age to establish reliable information. Once positive proof has been attained, a bull can have a long productive life as an A.I. proven sire. If a bull's daughters' performance information is below the breed average, the bull is said to have "negative proof." The effect of a negative proof depends on the area in which the proof is negative. Such factors include milk production, butterfat, protein production, or classification. For example, the industry, as of the time of trial, was less concerned with negative butterfat proof. Although a bull might *610 be negative in two or more of the four major factors, this might lessen, but not totally destroy, demand for the bull's semen. At the time of trial, Prophet's proof was negative with respect to milk production, butterfat, and protein production. His classification or type was positive. One reason for Prophet's unsatisfactory proof was that during the proving process, the USDA raised the standards for proof. Under the old standards, Prophet would have obtained a positive proof. When it became evident that Prophet would not qualify under the new USDA standards, Prophet was moved to Canada where the proving standards are less rigid. At the time of trial, the attempt to prove Prophet in Canada was still in process. The following amounts of semen were sold from Prophet: 1982
$126,289.22
1983
213,401.00
1984
58,162.50
1985
32,179.84
1986
5,791.92
1987 (6 mos.)
4,796.54
TOTAL
$440,621.02
After purchase of their interests in Prophet, petitioners and the other co-owners purchased a one-year mortality insurance policy on Prophet, effective April 13, 1982, in the amount of $400,000. The insurance was provided through a master policy issued to Dreamstreet, *611 and Prophet was added as a endorsement to the master policy. The premium for this policy was paid by petitioners and the other co-owners. By insuring Prophet through Dreamstreet's master policy, the premium was less than had the policy been purchased directly. When the policy expired in April 1983, it was not renewed. At that time, West Brook held over 7,000 ampules of Prophet's semen in storage. The agent who sold the insurance policy testified that mortality insurance was expensive, and it was customary in the industry that, when sufficient semen was held in storage, the owners of a bull usually self-insured and considered the value of the semen in storage as security in the event the animal died. Although Prophet was purchased by petitioners and others, registration of the bull with the Holstein-Freisian Association continued in the name of Dreamstreet. It was common practice in the Holstein cattle industry for animals to be registered in one name while actually being owned by someone else. Often an animal retained the name of the "selling farm" for promotional purposes. In some instances, different groups owned an animal, and the animal was registered under only one group's *612 name. This was often the case at cattle shows and in auction catalogs. It was common knowledge in the industry that Dreamstreet engaged in this practice on behalf of absentee owners. Dreamstreet typically held a security interest in most of the cattle it sold and incurred expenses in promoting these cattle and their offspring. Accordingly, Dreamstreet had an interest in the continuing value of such cattle. Its position was that the value of such cattle was adversely affected if the cattle were not allowed to retain the Dreamstreet prefix. In a few instances, owners objected to having their cattle registered in Dreamstreet's name. In such cases, Dreamstreet would oblige their customers by having the registrations changed. Dr. Samuel T. Slack, a retired professor in the animal science department of the College of Agriculture and Life Science at Cornell University, testified he was familiar with Dreamstreet's practice of keeping animals registered in the Dreamstreet name even though such animals were owned by others. He acknowledged that a farm name or a good breeding establishment established a reputation, and it was advantageous for the buyer to have the animal retain that *613 farm's name for advertising and marketing purposes. He also stated that, if an animal retained the breeder's prefix, the breeder and animal could better qualify for various prestigious awards. He noted that there were certain farm prefixes within the industry which produced top cattle. Accordingly, cattle from these farms were in demand. Sutherland, Executive Secretary of the New York State Holstein Association, testified he was also familiar with Dreamstreet's practice of maintaining registration of animals in its name for unnamed owners. He stated that the New York State Holstein Association routinely accepted cattle in their shows and sales under the Dreamstreet name, with full knowledge that the cattle were owned by people other than Dreamstreet. He stated that Dreamstreet was one of the pioneers in cattle management for undisclosed owners and, as a result, such practice had become acceptable in the Holstein industry nationwide. Robert Shore (Shore) testified as an expert witness for petitioners as to the value of Prophet. Shore graduated from Ontario Agricultural College in Guelph, Ontario, in 1951, and from the Reppart School of Auctioneering in Decatur, Indiana, in *614 1953. At the time of trial, Shore was President of Shore Holsteins, Ltd., a North American cattle marketing and export company. He was an international auctioneer, active in sales of top quality registered Holstein cattle since 1953, as well as a judge at cattle shows involving purebred registered Holsteins on four continents. Heffering also testified as an expert for petitioners as to the value of Prophet. Heffering graduated in 1951 from the State University of New York at Canton with an Associate's Degree in Animal Science. He was a co-founder of Hanover Hill Holsteins, a North American Holstein breeding farm, as well as Hanover Hills Sales & Service, which for several years was a well-known auction company specializing in registered Holstein cattle. Heffering also judged major cattle shows in the United States, Canada, Great Britain, Argentina, and Japan. Dr. Ronald Buffington (Buffington) was another expert who testified for petitioners on the value of Prophet. Buffington graduated from Pennsylvania State University with a Bachelor of Science degree in Dairy Science in 1967, a Master of Science degree in Dairy Management and Genetics from Virginia Polytechnic Institute *615 and State University in 1971, and a Doctorate in Dairy Genetics and Management from Michigan State University in 1974. Buffington served as an extension dairyman in Virginia, working with 4-H Clubs and various dairy projects from 1967 through 1985. From 1975 through 1976, Buffington was a Sire Analyst for Curtis Breeding Service, where he was responsible for its Young Sire Development Program. Buffington then became Sales Coordinator for Select Sires, one of the leading Holstein artificial insemination firms, from 1976 through 1985, where he wrote approximately 1,000,000 sire directories and coordinated national sales and promotion efforts. From 1976 to the time of trial, Buffington had analyzed cows for proper matings on nearly 200 dairy farms in the United States. He was also a private consultant, counselling dairymen in the use of genetics in their herds. Buffington owned Rose Buff Holstein Consulting Service, his consulting firm. In addition, Buffington was the co-author of two books, "Holstein Investment Opportunities," and "Holsteins and Future Choices." Warren Wigsten (Wigsten) testified as an expert for respondent as to the value of Prophet. Wigsten graduated from *616 Cornell University College of Agriculture and Animal Husbandry in 1950. He has been in the business of breeding, selling, and purchasing registered Holstein cattle since 1950. He judged local cattle shows and county fairs and appraised registered Holstein cattle for private breeders, insurance companies, Cornell University, and the Internal Revenue Service. He was an active member of the New York State Holstein Association for 40 years and served as a delegate from New York to the National Holstein Convention. Shore, petitioners' expert, estimated that Prophet was worth between $400,000 to $500,000 in 1981 and that Prophet's $400,000 sales price was reasonable. His opinion was based on the superiority of Prophet's pedigree, comparable sales of registered Holstein cattle at public auctions, private sales, and public demand for frozen semen from Prophet at the time of the sale in 1981. Shore was familiar with Prophet and his cow family and testified that Prophet's pedigree and cow family were common knowledge within the Holstein industry. Shore testified that, from 1980 to 1982, there was a good market for an elite bull like Prophet. He pointed out that a comparable bull, Hanover *617 Hill Ambassador, another son of Bootmaker, sold for $400,000 at auction. He noted that Prophet's dam, Cassy, was one point higher in classification and was also higher in milk production and butterfat content than the dam of Hanover Hill Ambassador. Shore also pointed out that one other son of Bootmaker had been sold in 1980 to a Japanese investor for $230,000 cash. Heffering, for petitioners, agreed with Shore and stated that the $400,000 sales price for Prophet was consistent with his pedigree and with the price of similar animals selling at that time. Like Shore, he alluded to the sale of Hanover Hill Ambassador for $400,000, and noted that Hanover Hill Ambassador's dam had a lower rating in classification, milk production, and butterfat content than Cassy. For this reason, Heffering felt that Prophet could have been sold for $500,000 in 1981, noting that had Prophet achieved a proof similar to that of his sire, Bootmaker, or grandsire, Elevation, he could have generated semen sales of over two million dollars a year. If Prophet's proof had been positive, but not as high as Bootmaker or Elevation, Heffering estimated that Prophet could have been expected to generate $200,000 *618 to $500,000 a year in semen sales. Buffington, petitioners' final expert, testified that a bull could be purchased for cash or on "terms." He explained that a price quoted to purchasers included both principal and interest. However, the purchase price, if expressed in cash, was generally 50 percent of the "terms" price, excluding interest. Buffington stated that this concept had been common in the industry since 1979. Buffington was of the opinion that a fair market value of $400,000, for a sale of Prophet on "terms," was consistent with Prophet's pedigree and with the prices of similar animals in 1980 through 1984. Wigsten, respondent's expert, appraised Prophet on two separate occasions. The first appraisal was made in 1984 for the Internal Revenue Service. He then valued Prophet at $40,000 as of December 30, 1981. The second appraisal, dated September 1, 1987, submitted as his expert report at trial, also placed a value of $40,000 on Prophet, as of December 1981. In making each appraisal, Wigsten took into account Prophet's outstanding pedigree and outstanding individuality, and that Prophet was sold at a time of high prices in the cattle industry. In his report and *619 in his testimony, Wigsten acknowledged that, as of December 1981, Prophet had all the makings of becoming an outstanding bull. He cited Prophet's lineage, the production records of Cassy (the dam), and the outstanding record of Bootmaker (the sire). His report stated, in part: "'Dreamstreet Prophet' was highly qualified by pedigree to create wide interest as a breeding bull. His well known family gave him 'star quality' which set his value above many bulls of equal genetic merit and assured substantial semen sales." The report acknowledged that Prophet was sold at a time when competition was keen for top genetic animals. At trial, Wigsten acknowledged that, when making his first appraisal of Prophet, he was unaware that Cassy, Prophet's dam, had died shortly after Prophet's birth. His appraisal was based on the assumption that "carbon copies" of Prophet could be made, meaning that Cassy could be bred over and over with Bootmaker, thus assuring several offspring with the same high quality pedigrees. Because Cassy died, the possibility of carbon copies of Prophet were eliminated, and Wigsten agreed at trial that this factor could increase Prophet's value by at least 25 percent. In *620 addition, Wigsten conceded that the warranties petitioners received as to the collection and freezing of semen and guarantees of 200 pregnancies were "very relevant" to Prophet's early proof and added another 50 percent to Prophet's value. Wigsten also acknowledged that other factors such as the marketing program offered by Dreamstreet, the expertise of Dreamstreet, and the financing terms petitioners received added additional value. In summary, Wigsten increased his appraisal of Propher's value at trial from $40,000 to $110,000, as follows: $ 40,000 base value
$ 20,000 additional 50% for fertility warranties provided in the maintenance agreement
$ 20,000 additional 50% for management and promotion of Prophet by West Brook
$ 12,000 additional 30% for the financing "terms"
$ 8,000 additional 20% for advice and consultation
$ 10,000 additional 25% due to impossibility of producing a carbon copy of Prophet
$110,000 Total Value
Persson's joint Federal income tax return for 1981 was filed with the Andover, Massachusetts, Internal Revenue Service Center on June 18, 1982. The notice of deficiency to Persson was mailed on December 30, 1985. *621 Wood's 1981 income tax return was filed with the Andover, Massachusetts, Internal Revenue Service Center on October 26, 1984, and his 1982 return was filed on August 19, 1983. The notice of deficiency to Wood was mailed on July 30, 1986. Petitioners reported their income and expenses from Prophet on Schedule F of their respective returns as follows: Persson
1981
1982
1983
Income (semen sales)
-0- $14,000 $19,103 Expenses: Depreciation
$30,000 $44,000 $42,000 Insurance
$ 5,000 Interest
$15,840 Schedule F (Loss)
($30,000)
($35,000)
($38,737)
In addition, Persson claimed an investment tax credit of $20,000 in 1981 for the purchase of his interest in Prophet. Wood
1981
1982
Income (semen sales)
$4,667 Expenses: Depreciation
$10,005 $25,179 Schedule F (Loss)
($10,005)
($20,512)
Wood claimed on his 1981 return an investment tax credit of $6,670 for the purchase of his interest in Prophet. In the notice of deficiency to Persson, respondent disallowed the depreciation deductions of $30,000, $44,000, and $42,000 claimed, respectively, for 1981, 1982, and 1983, *622 and the $20,000 investment tax credit. No adjustment was made with respect to the $5,000 insurance expense for 1982, nor was any adjustment made to the $15,840 interest expense for 1983. With respect to Wood, respondent disallowed the $10,005 and $25,179 depreciation deductions for 1981 and 1982 and the $6,670 investment tax credit for 1981. No adjustments were made in the notices of deficiency with respect to the semen income reported by petitioners. However, on brief submitted after trial, respondent conceded that, if the transactions regarding the interests in Prophet lacked economic substance, the amounts reported by petitioners as income should be disregarded. At trial, respondent, adhering to the contention that the transactions involving Prophet lacked economic substance and should be ignored, moved to amend the Answers to allege that petitioners failed to report all income from Prophet's semen sales. Specifically, respondent alleged that Persson's income from semen sales should be increased from $14,000 to $63,144.61 and from $19,103 to $106,700.50, respectively, for 1982 and 1983. As to Wood, respondent moved to increase his income from $4,667 to $21,048.20 for 1982. *623 Those amounts were all based upon the stipulation of the parties that gross semen sales from Prophet were $126,289.22 and $213,401, respectively, for 1982 and 1983 and were allocable to petitioners according to their proportionate interests in the bull. OPINION (1) The Statute of Limitations
In their petitions, Persson and Wood alleged that respondent was barred from the assessment and collection of taxes against them by reason of the statute of limitations. Section 6501(a) provides in part: (a) General Rule. -- * * * the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) * * * and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. Section 6212 authorizes respondent to issue a notice of deficiency if respondent determines that there is a deficiency in a taxpayer's income tax. Section 6213(a) provides generally that no assessment of a deficiency and no levy or proceeding in court for collection shall be made, begun, or prosecuted until 90 days (or 150 days if the notice is *624 addressed to a person outside the United States) after the notice of deficiency has been mailed to the taxpayer and, if a court proceeding is instituted by the taxpayer, the prohibition against assessment and levy continues until the judicial determination becomes final. Section 6072(a) provides, for our purposes here, that income tax returns for a calendar year taxpayer shall be filed on or before the 15th day of April following the close of the calendar year. For the years 1982 and 1983, petitioners were required to file their returns, respectively, by April 15, 1983, and April 16, 1984. Sections 6072(a) and 7503. A return filed prior to this date is deemed filed on this date for purposes of the limitations provided in section 6501(a). The general statute of limitations, therefore, for these years extended, respectively, to April 15, 1986, and April 16, 1987. The notice of deficiency to Persson was mailed on December 30, 1985. Therefore, with respect to Persson's 1982 and 1983 tax years, the notice of deficiency was issued timely and, accordingly, assessment of any deficiency for those years is not barred by the statute of limitations. With respect to Wood, the notice of *625 deficiency was mailed to him on July 30, 1986. His 1981 and 1982 returns were filed, respectively, on October 26, 1984, and August 19, 1983. Since the three-year period of limitations under section 6501(a) commenced from the date the returns were filed, it is evident that the notice of deficiency was issued timely, and assessment of any deficiency for either of those two years is not barred by the statute of limitations. Persson's 1981 return, however, presents a different situation. His 1981 return was filed June 18, 1982. Thus, the period of limitations for such year extended to June 18, 1985. The notice of deficiency was mailed December 30, 1985, a date clearly beyond the three-year period under section 6501(a). Respondent alleged, however, in the Answer, that Persson and his wife had timely executed an agreement in writing, pursuant to section 6501(c)(4), to extend the time for assessment for the year 1981 until December 31, 1985. Therefore, respondent affirmatively alleged that the notice of deficiency mailed on December 30, 1985, was timely by virtue of the exception to the general rule under section 6501(c)(4). Persson did not file a Reply to respondent's affirmative *626 allegations. Moreover, respondent failed to move, under Rule 37(c), to have the affirmative allegations in the Answer deemed admitted. Rule 37(c) provides, under such circumstances, that the affirmative allegations are deemed denied. Petitioner has the burden of proving when the return was filed, when the period of limitations expired, and that the notice of deficiency was not mailed to him within such period. United States v. Gurley,415 F.2d 144 (5th Cir. 1969); Robinson v. Commissioner,57 T.C. 735 (1972). In Adler v. Commissioner,85 T.C. 535, 540 (1985), this Court held that the bar of the statute of limitations is an affirmative defense, and the party raising it must specifically plead it and carry the burden with respect thereto. Rules 39, 142(a). Where it is shown that the notice of deficiency was issued beyond the normally applicable period of limitations, the party pleading the defense has established a prima facie case. At that point, the burden of going forward with the evidence shifts, and the other party has the burden of introducing evidence to show that the bar of the statute is not applicable. Here, Persson *627 established a prima facie case that the notice of deficiency for his 1981 tax year was issued beyond the general three-year period of limitations for that year. The burden of going forward with the evidence then shifted to respondent. Respondent offered no evidence to meet this burden but only alleged in the Answer that an extension agreement had been executed by the Perssons. A copy of the agreement was not attached to the Answer; the parties did not stipulate to the existence of such an agreement; the agreement was not offered into evidence at trial, nor was any testimony adduced with respect to this question. Without proof that an extension had in fact been executed by the parties, it is evident that the period for assessment and collection of tax against Persson for 1981 expired on June 18, 1985. The notice of deficiency was mailed on December 30, 1985. Respondent, therefore, did not satisfy the burden of going forward with the evidence. Accordingly, petitioner Persson is sustained on this issue as to the year 1981 and assessment of any deficiency is barred by the statute of limitations with respect to Persson's 1981 tax year. (2) Whether the Transactions Purportedly *628 Conveying Undivided Interests in a Registered Holstein Bull Should Be Disregarded
Although respondent did not directly contend that petitioners' transactions in their acquisition of undivided interests in Prophet were shams, respondent argued that the transactions lacked economic substance, were motivated solely for tax benefits and were bereft of any business purpose and, therefore, should be disregarded for tax purposes. The Court construes such argument as a contention that the transactions were shams. Taxpayers are generally free to structure their business transactions as they wish, even if motivated by tax reduction considerations. Gregory v. Helvering,293 U.S. 465 (1935); Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184, 196 (1983), affd. on this issue 752 F.2d 89 (4th Cir. 1985). It is well settled that a transaction entered into solely for the purpose of tax reduction which is without economic, commercial, or legal purpose, other than the expected tax benefits, is an economic sham without effect for Federal income tax purposes. Frank Lyon Co. v. United States,435 U.S. 561 (1978); Larsen v. Commissioner,89 T.C. 1229 (1987); *629 Rice's Toyota World, Inc. v. Commissioner,supra at 196; Grodt & McKay Realty v. Commissioner,77 T.C. 1221, 1243 (1981). The existence of tax benefits accruing to an investor does not necessarily deprive a transaction of economic substance. Frank Lyon Co. v. United States,supra;Estate of Thomas v. Commissioner,84 T.C. 412, 432 (1985). The record clearly does not support respondent on this issue. There was no sham involving petitioners' acquisitions of interests in the bull. The seller, Dreamstreet, was a reputable cattle breeder, and the buyers, petitioners, were reputable individuals. The bull was an identifiable animal located on a farm within several miles from where the parties lived. Petitioners were familiar with the bull and Dreamstreet's operations. There is no evidence that any of the income or expenses attributable to the bull were commingled with Dreamstreet's operations. The parties executed contracts with each other, and all evidence points to the fact that the respective obligations under these contracts were performed. There is every indication in the record that Dreamstreet regarded *630 petitioners as owners of the bull and, similarly, petitioners considered themselves as owners. In short, the record supports a finding that the transactions involving Prophet were supported by a business purpose and had economic substance. Rice's Toyota World, Inc. v. Commissioner,supra at 196. The transactions, therefore, involving petitioners' acquisitions of interests in the bull are recognizable for Federal income tax purposes. (3) Whether the Benefits and Burdens of Ownership Were Transferred to Petitioners in Their Purported Purchase of Interests in the Bull
Our finding that the transactions involving petitioners' acquisitions of interests in the bull were not devoid of economic substance does not preclude further inquiry into whether the transactions constituted a sale for Federal income tax purposes. Packard v. Commissioner,85 T.C. 397, 419 (1985), citing Commissioner v. Court Holding Co.,324 U.S. 331, 334 (1945). It has long been recognized that the tax consequences of transactions are governed by substance rather than form. Gregory v. Helvering,293 U.S. 465 (1935); Commissioner v. Court Holding Co.,supra at 334. *631 Whether the purported transactions here were, in substance, sales for Federal tax purposes is a question of fact. A sale is a transfer of property for money or a promise of payment. For purposes of Federal taxation, a sale occurs upon transfer of the benefits and burdens of ownership, rather than upon the satisfaction of the technical requirements for the passage of title under state law. Leahy v. Commissioner,87 T.C. 56, 66 (1986). This question must be ascertained from the intention of the parties as evidenced by the written agreements read in light of the attending facts and circumstances. Grodt & McKay Realty, Inc. v. Commissioner,supra at 1237. This Court has applied the following factors in deciding whether a transaction is to be recognized as transferring ownership for tax purposes: (1) Whether legal title passes; (2) How the parties treat the transaction; (3) Whether an equity was acquired in the property; (4) Whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) Whether the right of possession is vested in the purchaser; *632 (6) Which party bears the risk of loss or damage to the property; and (7) Which party receives the profits from the operation and sale of the property. Cherin v. Commissioner,89 T.C. 986, 997 (1987); Grodt & McKay Realty, Inc. v. Commissioner,supra at 1237-1238. Petitioners executed doeuments sometime in 1982 which purported to convey title to them of undivided interests in Prophet, effective as of December 1, 1981. Respondent argues vigorously that title in the bull never passed for the reason that registration with the Holstein-Freisian Association of America and the Holstein Association of Canada was never changed to reflect petitioners and the other purported purchasers as owners of the bull. Respondent pointed to the Security Agreements which allowed registration in the name of the secured party (Dreamstreet) only if request was made by the secured party and that such request was never made by Dreamstreet. Moreover, respondent argued, petitioners allowed Dreamstreet, in its advertisements, to hold itself out as the owner of Prophet. Petitioners were well aware that Prophet continued to be registered in the name of Dreamstreet, *633 and that Dreamstreet held itself out as owner in its extensive advertisements of Prophet. Petitioners never objected but consented to these practices. Moreover, petitioners presented uncontroverted evidence that Prophet's registration in Dreamstreet's name was standard industry practice in the case of high-priced, high-quality registered Holstein dairy cattle. This was attested to by Professor Slack of Cornell University who testified that retention of the Dreamstreet prefix substantially increased the value of an animal because of Dreamstreet's reputation in the Holstein industry and that such practice was advantageous for advertising purposes. The Executive Secretary of the New York State Holstein Association, Sutherland, testified that this practice, although pioneered by Dreamstreet, was accepted and practiced in the Holstein industry. The fact that Dreamstreet was a premium breeder of high-quality dairy cattle was acknowledged by respondent's expert, Wigsten. Respondent next argues that, if title passed, the date for passage of title was in 1982 at the time the parties signed the final agreements rather than December 1, 1981, the recited effective date. The Court finds *634 that the parties commenced negotiations for the bull well before the end of 1981, and those negotiations were concluded by the end of that year, and in fact by December 1, 1981. The agreements, signed in March 1982, expressly provided that they were effective as of December 1, 1981. Persson's first payment on his note was by check dated December 31, 1981, and it was honored by his bank on January 6, 1982. The Court declines to accept respondent's argument that this payment represented a "binder" for the bull. There is no evidence in the record to substantiate the characterization of this payment as anything but a payment on the note which was executed for the agreed purchase price for Persson's interest in the bull. By December 1981, all tests on Prophet had been concluded and it was determined that the bull could produce semen and would adapt to an artificial insemination environment. The Court finds as inconsequential the fact that petitioners did not purchase mortality insurance on the bull until April 13, 1982. West Brook carried insurance on all animals under its care, and such insurance included risks of loss from fire, theft, extended coverage, and liability to third persons. *635 The insurance petitioners purchased on April 13, 1982, was mortality insurance which provided petitioners with coverage of an additional risk (such as natural death) which was not included in the general insurance coverage provided by West Brook. The Court does not construe petitioners' purchase of mortality insurance on April 13, 1982, as evidence that they did not own the bull prior to that date. On this record, the Court is satisfied and finds that all events for the consummation of a sale of the bull transpired and were concluded during 1981, and, accordingly, petitioners acquired their interests in Prophet in 1981. The retention of the bull's registration in Dreamstreet, and the advertisements by Dreamstreet in which it held itself out as owner of the bull, made good economic sense, enhanced the sales of semen, and increased Prophet's value, all of which was with the consent and concurrence of petitioners. The fact that the parties treated the transaction as a sale was best established by respondent's witness, Estes, one of the co-purchasers of Prophet. After the sale, Estes received annually from Dreamstreet a form letter advising him that Dreamstreet was being audited *636 by its certified public accountants, and the letter requested that Estes correspond directly with the auditors to confirm the accuracy or inaccuracy of his indebtedness to Dreamstreet. The letter described the date of his note, the original amount, the unpaid principal, the interest rate, and the date to which interest was paid. The letters noted, each year, that, "if the above is not in agreement with your records, please note in the space provided the particulars shown in your records and any information which may help reconcile the difference from our records." Estes answered virtually all of these letters in which he expressed his disagreement with the amounts stated as being unpaid. He did not, however, advise the auditors that he was not indebted to Dreamstreet, nor did he indicate in any way that he did not own an interest in the bull for which the indebtedness was executed. Although it is without question that West Brook failed to provide the co-owners of Prophet with a quarterly report of its activities in the sale of semen, nor is there any indication from the record that Estes' various letters of disagreement to the auditors were ever reconciled, the actions of Estes *637 establish that he certainly considered his note a valid indebtedness; that he knew Dreamstreet carried this note on its records as an asset; and that Dreamstreet made entries in its books and records reflecting payments of principal and interest, even though he (Estes) disagreed with these entries. The fact that West Brook was not reporting or accounting to the owners of Prophet or the fact that the owners did not agree with the credits being applied by Dreamstreet to the notes does not establish that there had been no sale of Prophet. In the Court's view, the actions of Estes affirmed his view, at the very least, that there had been a sale, that he owned an interest in Prophet, and that Dreamstreet carried an indebtedness on its books for payment of this asset. There was no evidence presented at trial which showed that petitioners viewed the matter any differently. The Court finds, therefore, that the parties treated the transaction as a sale. Respondent argues that petitioners acquired no equity in the bull for the reason that petitioners submitted no evidence showing what their principal and interest obligations were on their notes; that the audit confirmation letters annually *638 sent to Estes by Dreamstreet were confusing, contradictory, and misleading; that unpaid interest on the notes was never added to principal, and the failure of West Brook to provide periodic accountings of semen sales, operating expenses, commissions, and applications of net proceeds to principal and interest "demonstrated that there never was an intent by Dreamstreet that the petitioners would acquire any equity in the bull." As the Court views this case, such an argument is misplaced. While the record provides a factual basis for respondent's assertions, this argument has no bearing as to whether petitioners and the other purported purchasers of Prophet acquired an equity in the bull. If Dreamstreet and West Brook were derelict in the areas suggested by respondent, petitioners obviously had legal remedies available to them to compel performance of those obligations. The record is clear that Persson and Estes made the cash payments required under their notes and, to that extent, they acquired an equity interest in the bull. Moreover, the audit confirmation letters sent to Estes reflected reductions in principal beyond the cash payments he made, establishing to the Court's satisfaction *639 that sufficient semen sales were being made to allow for payments on the note, including reductions of principal. Contrary to respondent's argument, the notes do not provide that unpaid interest should be added to principal. The record shows, therefore, that petitioners acquired an equity in the bull on the obligations they executed for payment of their interests. In connection with the equity question, the Court notes that petitioners, in the maintenance agreements with West Brook, were obligated to pay "reasonable operating expenses" for the maintenance of Prophet. These expenses included "reasonable cost of feed, grain, roughage and fodder, * * * necessary labor, shelter, use of barns, pastures, execise [sic] areas, veterinary expenses, semen collection and freezing expenses." In Houchins v. Commissioner,79 T.C. 570, 595 (1982), the Court found that the specified dollar amounts to be paid by investors for similar services in a management agreement were excessive and had no relationship to the actual costs for such services. Here, petitioners obligated themselves to pay the actual expenses for maintaining the bull. Petitioners were not burdened with *640 extraneous management expenses which, as in Houchins, effectively eliminated any practical possibilities of the investors ever acquiring any equity interests. Petitioners' maintenance agreements with West Brook did not preclude the accumulation of equity in Prophet. The transactions between Dreamstreet, West Brook, and petitioners were all documented by written agreements. The record shows that the parties substantially performed their obligations under these agreements. There were, therefore, present obligations upon the seller to execute and deliver and concomitant obligations upon petitioners to make payments. The agreements, therefore, met this factor in deciding whether the benefits and burdens of ownership transferred. As purchasers of the bull, petitioners and the other co-owners had exclusive rights to its possession. They elected to have the bull cared for and managed by West Brook under the maintenance agreements. It is evident from the nature of the animal, and the use which was expected of it, that possession and maintenance should be with someone having the necessary facilities and possessing the necessary skills to care for and exploit such an animal. Persson, *641 who himself had considerable experience with Holsteins, acknowledged that he could not provide the management necessary for the care and exploitation of Prophet. It is without question that West Brook had the necessary expertise and did in fact manage the bull professionally. Respondent argued that Dreamstreet later abrogated the maintenance agreement by moving the bull to Canada without obtaining the prior approval of petitioners. The Court finds, however, that this came about when Prophet could not establish a satisfactory proof in the United States, and the bull was moved to Canada to attempt a satisfactory proof there. Such action necessarily required different terms and arrangements; however, no evidence was presented to show that these actions were for any purpose other than the attempt to attain a positive proof for the bull. The fact that Prophet did not attain a positive proof in the United States was not a matter which could be foreseen by the parties at the time the agreements were entered into. Although the prior consent of petitioners may not have been obtained by Dreamstreet, the Court is satisfied that petitioners were not kept in the dark by Dreamstreet as to those *642 and other changes made in the collection, inventorying, and sales of semen. Petitioners, at the very least, implicitly consented to these changes. The Court is satisfied that petitioners bore the risk of loss of Prophet. At their expense, they purchased a one-year mortality insurance policy shortly after they purchased their interests. The insurance was not renewed; however, it was established that such insurance was expensive and it was customary in the industry to self-insure where a sufficient bank of semen had been accumulated which would fairly compensate the owners in the event of the bull's death. With respect to whether petitioners could ever expect to receive profits from the sale of semen, respondent argued that, with the costs provided for in the maintenance agreements, coupled with the actual proceeds realized from sales of semen, it was unlikely that petitioners would ever realize any profits from their activity. Several observations are in order in connection with this aspect of the evaluation. Everyone recognized at the time they entered into the agreements there was no guarantee that Prophet would develop into a profitable bull. Everyone agreed, including the *643 experts, that Prophet had an excellent pedigree and had all the makings of a bull which could develop into an extremely valuable animal. Everyone further agreed that, no matter how good a pedigree an animal might have, there was no assurance or guarantee that such animal would live up to expectations. Indeed, Prophet did not prove out as expected. Respondent's argument, therefore, is based on hindsight rather than foresight. The evidence indicates that Dreamstreet and West Brook did their level best to promote and advertise Prophet, and substantial sales of semen were in fact realized as a result of those efforts. Looking at the case as of December 1, 1981, had Prophet received positive proof, the record indicates that petitioners could expect, at some time, a profit from their venture. Aside from the question as to whether profits would ever be realized, the record shows that proceeds from the sale of semen were credited to petitioners in accordance with their interests in the bull, out of which maintenance expenses were paid to West Brook, and the remainder was applied to payment of interest and reduction of principal on petitioners' notes. Petitioners, therefore, met this *644 final criteria on the benefits and burdens of ownership question. In sum, the Court concludes that the benefits and burdens of ownership of Prophet transferred from Dreamstreet to petitioners. Accordingly, the Court holds that a sale occurred for tax purposes. (4) The Value of the Bull as of December 1, 1981
The Court views this issue as the pivotal question in this case. Respondent determined the bull had a value of $40,000; petitioners contend the bull's value was $400,000. Petitioners' experts all agreed that the $400,000 purchase price for Prophet was at least equal to the bull's value in 1981. More specifically, Shore and Heffering testified that Prophet was worth between $400,000 to $500,000 based on the uniqueness of his pedigree, comparable sales of registered Holstein cattle at public auctions, and private sales and public demand for frozen semen in 1981. These experts were experienced with Holstein cattle and had personal knowledge of Prophet and Prophet's cow family. However, the opinions of Shore and Heffering are subject to question. In their written reports, both referred to comparable sales in support of a $400,000 value for Prophet. At trial, *645 the only comparable sales they identified were sales in 1980 and 1981 of two bulls, Hanover Hill Ambassador and Hilltop Hanover, both of which had been sired by Bootmaker (Prophet's sire), and sold, respectively, for $400,000 and $230,000. The details of these sales were not presented to the Court. Although it is without question that these two bulls had outstanding pedigrees, equivalent to Prophet's pedigree, the Court was not favored with copies of the sales documents and other information, such as the ages of the bulls at the time they were sold, the terms and conditions of their sale, the promotion and marketing efforts, if any, which had been undertaken on these bulls, their state of health at the time of sale, or any other information from which the Court could decide whether these bulls, although of close kinship to Prophet, were comparable to Prophet. Heffering testified that the sales price of $400,000 for Hanover Hill Ambassador was financed, and presumably this accounted for the inflated price. As noted later in this opinion, this Court does not attribute additional value to an asset, the sale of which is financed compared to the same asset sold for cash. The opinions *646 of Shore and Heffering were further discredited by virtue of their written reports. Both were identical and were evidently prepared by the same person, using the same typewriter. Shore acknowledged he had not prepared or drafted his report, but that it had been mailed to him by Francis Wood. He signed the report and mailed it to Mr. Wood. Heffering insisted that he prepared his report, although he acknowledged that it was typed by Mr. Wood's secretary. He signed the report at Mr. Wood's office, and the date of his report is identical to the date of Shore's report. Both reports are very general and provide no substantive basis for their opinions. While these observations are not intended to question the expertise of Shore and Heffering, they certainly call into question the merits of their conclusions as to value. Accordingly, the Court finds that their opinions were not representative of Prophet's value. Another of petitioners' experts, Buffington, testified that a fair market value of $400,000 was consistent with Prophet's pedigree and with the price of similar animals from 1980 through 1984. He testified he was unable to find another bull calf in 1981 with a better pedigree *647 anywhere in the United States. However, he qualified his $400,000 valuation when he acknowledged that Prophet's value in a cash transaction would have been $200,000, or one-half of $400,000, because the sale was financed. Respondent's expert, Wigsten, refuted the values of petitioners' experts. His opinion was that Prophet had a fair market value of $40,000. In preparing his two appraisals of Prophet, Wigsten placed great weight on Prophet's pedigree, individuality, and considered the fact that Prophet was sold during a period of high prices in the cattle industry. His evaluations of Prophet's pedigree were equally as effusive as those of petitioners' experts. Wigsten conceded, however, that certain other factors could be considered to increase his $40,000 estimate of Prophet's value. Specifically, he admitted the fertility warranties provided by Dreamstreet could increase Prophet's value by 50 percent; Dreamstreet's management and promotion of Prophet could increase the value by an additional 50 percent; an additional 30 percent in value was allowable for the financing terms; 20 percent additional for Dreamstreet's advice and consultation; and an additional 25 percent for *648 the fact that a carbon copy of Prophet could not be produced due to the death of his dam, Cassy. Factored in, those additional elements increased Wigsten's valuation to $110,000. The opinions of experts are admissible and relevant to the issue of value; however, the Court must weight such evidence in light of the demonstrated qualifications of the expert and all other evidence of value. The Court may embrace or reject expert testimony, doing whatever, in the best judgment of the Court, is appropriate. Chiu v. Commissioner,84 T.C. 722, 734 (1985); Johnson v. Commissioner,85 T.C. 469, 477 (1985). Petitioners' expert, Buffington, was thorough and professional. His appraisal was performed with adequate care. The same can also be said of respondent's expert, Wigsten. The Court is of the opinion that, when the opinions of these two experts, Wigsten and Buffington, are considered together, a reasonable determination of Prophet's value can be fashioned. On this record, the Court finds that Wigsten's base value of $40,000 was low and was not representative of Prophet's value. Wigsten admitted he lacked experience valuing high-priced, high-quality *649 dairy cattle since most of his experience was with commercial cattle. The highest he had ever appraised an animal for respondent was $75,000. On the other hand, the Court finds that Buffington's value of $200,000 for the cash value of Prophet was high and also not representative of Prophet's value. The Court is not satisfied from his testimony and his report that such an amount was corroborated either by comparable sales or other evidence which would sustain a $200,000 value. The Court further places no additional value on Prophet arising out of the fact that the sale was financed. Petitioners obligated themselves to pay interest on the portion of the sales price which was financed. To say that the benefits of financing add value or form a component of fair market value is simply not supported by any business logic, nor does the Court attribute any additional value to the fertility warranties and the advice and consultation of Dreamstreet. Such provisions generally exist in a sale of this nature, and their value would be attributable more to the management services than the value of the animal itself. Grodt & McKay Realty, Inc. v. Commissioner,supra at 1239; *650 Houchins v. Commissioner,supra at 593. The Court, however, is of the opinion that Dreamstreet's management, advertisement, and promotion of Prophet prior to the sale to petitioners was a significant item which, without doubt, contributed to early successes in the sales of semen and should be considered in the valuation of Prophet. The Court accepts Wigsten's opinion that this factor should account for 50 percent of the base value. The Court is also of the opinion that, since a carbon copy of Prophet was no longer possible because of the death of Cassy, such factor should add further value, for which Wigsten's estimate of 25 percent of base value is accepted. Taking all of these factors together, it is the Court's finding that Prophet's value as of December 1, 1981, was $175,000, based on the following: $100,000 base value
50,000 Dreamstreet's promotion efforts prior to the sale
25,000 for the inability to produce a carbon copy
(5) Whether The Activity Was Not Engaged In For Profit
Section 183(a) provides generally that, where an individual is engaged in an activity, "if such activity is not engaged in for profit, *651 no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Section 183(b)(1) provides that deductions which would be allowable without regard to whether such activity is engaged in for profit shall be allowed, and section 183(b)(2) provides that deductions which would be allowable only if such activity were engaged in for profit shall be allowed "only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1)." Section 183(c) defines an activity not engaged in for profit as follows: (c) Activity Not Engaged in for Profit Defined. -- For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212. The question here is whether petitioners' ownership of undivided interests in the bull constituted an activity such that the expenses incurred in that activity qualified for deduction under either section 162 or 212. Otherwise, the activity was "not engaged in for profit" *652 and the provisions of section 183 would apply. For an activity to satisfy the profit objective test of section 183, it must be carried on with an actual and honest profit objective. Levy v. Commissioner,91 T.C. 838, 871 (1988). The expectation of profit need not be a reasonable one, but there must be a bona fide objective of realizing a profit. Allen v. Commissioner,72 T.C. 28, 33 (1979). The issue of whether there is an objective to make a profit is to be resolved on the basis of all the facts and circumstances, and the burden of proving the requisite objective is upon petitioners. Abramson v. Commissioner,86 T.C. 360, 370 (1986); Flowers v. Commissioner,80 T.C. 914, 931-932 (1983). The factors which are determinative as to whether an activity is engaged in for profit are set forth in section 1.183-2(b), Income Tax Regs. These factors are not applicable in every case; however, a careful review of the facts and circumstances remains the primary test. Abramson v. Commissioner,supra at 371. Petitioners' objective to realize a profit in this case was supported by the evidence. For *653 example, several expert witnesses, including one of respondent's, pointed out that the Holstein industry was riding the crest of record high prices for top pedigreed animals in 1981. These experts testified that, in light of these industry conditions, petitioners could have expected Prophet's value to appreciate dramatically over his purchase price if Prophet had achieved a positive proof. Heffering testified that Prophet could have generated semen sales of over two million dollars a year if he had achieved a proof similar to his sire, Bootmaker, or grandsire, Elevation, or at the very least, sales of $200,000 to $500,000 a year. This view was shared by Shore. Respondent's expert, Wigsten, stated the following in his report: I feel Prophet had an excellent potential for income from semen sales because of the wide recognition gained by the high-level of promotion of the cow family. Many Holstein breeders and even many grade dairymen would have been willing to pay for his semen to sample in their herds. This actually did take place as the "progeny report" on Prophets' daughters shows. His proof issued in July 1987 and that he had 778 daughters in 540 herds on test for milk *654 production which would indicate that quite a few thousand ampules of his semen were sold * * *. Other facts were also indicative of a profit objective. For example, petitioners were intimately acquainted with the registered Holstein cattle industry, and more specifically with the reputation of Dreamstreet and Prophet. Persson had previously owned and operated a reputable dairy farm. He had consulted an independent expert in starting his farm and assembling his herd. He had dealt with high quality Holsteins. Consequently, Persson was knowledgeable in the management and in the qualities necessary to develop a prize-winning dairy animal. Person was also a resident of Walton, where Dreamstreet was headquartered. Thus, he was familiar with the Dreamstreet operation and its reputation in the industry. He was confident that Prophet would be managed in an expert manner. Similarly, Wood was an attorney for Dreamstreet and was in a unique position to know the operations of Dreamstreet and the conditions of the dairy cattle market in 1981. Both Persson and Wood were able to apprise the soundness of their investment by consulting their contacts in the Holstein industry, as well as by *655 attending cattle auctions and reading trade journals. Furthermore, as a result of petitioners' proximity to Dreamstreet, they were able to receive information concerning their investment in Prophet through verbal reports regarding semen sales, health, and the milk production of his daughters. Finally, the parties stipulated that Prophet's semen generated sales of $440,621.02 from 1982 through the first half of 1987. Although petitioners admittedly took into account tax considerations in making their investment decision, on balance, the Court is convinced that they purchased Prophet and held him throughout the years with the actual and honest objective of deriving a profit. In calculating the anticipated profit over the long haul, the Court is satisfied that petitioners took into account the economic consequences of their investment apart from its tax benefits. Based on all the facts and circumstances, the Court holds that the activity involved here was not an activity not engaged in for profit. Section 183, therefore, does not apply to this activity. (6) Whether The Promissory Notes Were So Contingent That They Are Not Includable In The Cost Or Basis Of The Bull
*656 Respondent contends that liability on the notes executed by petitioners was so contingent or illusory that the amount of the notes should not be included in petitioners' cost or basis of Prophet for depreciation and investment credit purposes. Respondent argues that the notes were nonrecourse obligations based upon the language in each note that "all subsequent payments of principal and interest shall be made from the sale of semen from the maker's herd, but in no event later than December 31, 1988." After December 31, 1988, if semen sales were not sufficient to completely pay principal and interest on the notes, respondent argues that petitioners were not personally liable for payment of the remaining balance due on the note. Neither the notes nor any of the other documents executed in connection with the sale stated that the liabilities of petitioners were either restricted or limited. Persson testified unequivocally that, if semen sales were not sufficient to pay the note in full, he expected and understood that he would be personally liable for the unpaid portion of his note. Francis W. Wood also testified that petitioners' obligations were full recourse obligations, and *657 that he expected the maker of each note would be personally liable if, as of December 31, 1988, semen sales proceeds did not fully pay the notes. The Court notes that Francis W. Wood was an attorney who had practiced law and was quite familiar with financing transactions. His brother, petitioner Wood, was a practicing attorney. Persson was an astute businessman. All parties, therefore, knew and understood the full import of the documents they executed. If they intended that the notes they executed would be nonrecourse, they all knew and understood that such language would have been necessary in the notes and security agreements. Such language was not in the notes and the other documents they executed. On this record, therefore, the Court finds that the obligations petitioners executed were full-recourse, personal liability obligations. (7) Whether Petitioners Were At Risk Under Section 465
Under section 465, any loss with respect to a farming activity is allowed only to the extent the taxpayer is financially at risk with respect to the obligations of the farming activity at the close of the taxable year. Sections 465(a)(1) and 465(c)(1)(B). Taxpayers generally *658 are considered to be financially at risk with respect to investments in farming activities to the extent they contribute money to the activities. Section 465(b)(1)(A). Taxpayers are also considered to be financially at risk to the extent they are personally liable for repayment of debt obligations incurred in connection with the activity. Section 465(b)(2)(A). Section 465(b)(3), however, imposes limitations on amounts with respect to which taxpayers are considered at risk. Under this provision, taxpayers are not at risk for debt obligations with respect to farming activities if the particular creditors associated with the activities either have continuing interests other than as creditors, or have a relationship to the individual specified within any one of the paragraphs of section 267(b). Section 465(b)(3) provides: (3) Certain borrowed amounts excluded. -- For purposes of paragraph (1)(B), amounts borrowed shall not be considered to be at risk with respect to an activity if such amounts are borrowed from any person who -- (A) has an interest (other than an interest as a creditor) in such activity, or (B) has a relationship to the taxpayer specified within any one of *659 the paragraphs of section 267(b). Respondent argues that petitioners were not at risk because they had no personal liability on their notes. For the reasons recited earlier, the Court finds that petitioners had personal liability on the notes they executed in payment for their interests in the bull. Therefore, the Court rejects this argument. Respondent further contends petitioners were not at risk because their obligations represented amounts borrowed from a person who had an interest other than as a creditor under section 465(b)(3)(A). As to Wood, respondent further argues that his liability constituted an amount borrowed from a person with whom he had a relationship specified within section 267(b), therefore, Wood was not at risk under section 465(b)(3)(B). The language "interest other than an interest as a creditor" is not defined in section 465 or the committee reports accompanying the Tax Reform Act of 1976 which enacted section 465. Pub. L. 94-455, 90 Stat. 1520, 1531. In 1979, the Treasury issued proposed regulations which provided that a lender would be deemed to have an "interest other than an interest as a creditor" only if the lender had either a capital interest *660 or a net profits interest in the activity. Section 1.465-8(b)(1), Proposed Income Tax Regs., 44 Fed. Reg. 32239 (June 5, 1979). To date, these proposed regulations have not been finalized. However, this Court, in several cases, has utilized the "capital interest - net profits interest" test of the proposed regulations as a guideline in determining whether creditors in a transaction have the prohibited interest. Levy v. Commissioner,supra;Larsen v. Commissioner,89 T.C. 1229 (1987); Bennion v. Commissioner,88 T.C. 684 (1987); Waddell v. Commissioner,86 T.C. 848 (1986), affd. 841 F.2d 264 (9th Cir. 1988); Jackson v. Commissioner,86 T.C. 492, 529 (1986), affd. 864 F.2d 1521 (10th Cir. 1989). Respondent agrees Dreamstreet held notes executed by petitioners, and, as such, Dreamstreet did not retain either a capital interest or an interest in the net profits of Prophet. However, since West Brook was to be paid 35 percent of the net proceeds from sales of semen (after payment of management expenses), and since West Brook and Dreamstreet were owned by *661 Francis W. Wood, the 35 percent commission payable to West Brook constituted an "interest in net profits" and such interest, respondent argues, was attributable to Dreamstreet. Thus, respondent argues petitioners were not at risk under section 465(b)(3)(A). Respondent argues that the 35 percent commission payable to West Brook was attributable to Dreamstreet because of the policies underlying section 465(b)(3)(A), citing Bennion v. Commissioner,supra at 697-698, where this Court stated: [Sec. 465(b)(3)(A)] * * * exclude[s] from at-risk * * * those amounts that are borrowed from creditors who, because of the nature of their continuing other interests in the activity, would not be likely to act as independent creditors with respect to the debt owed to them * * *. Creditors who hold recourse obligations, but who also have certain other interests in the activity, might disregard their rights thereunder in favor of protecting or enhancing their other interests in the activity. In light of that eventuality and in spite of the otherwise recourse nature of the debt, taxpayers who owe recourse debt obligations to such creditors are not to be regarded as at risk *662 with respect thereto. Thus, respondent argues, Francis W. Wood, as sole stockholder of West Brook had an interest in receiving distributions from West Brook. The ability of West Brook to make distributions was dependent upon earning income, some of which could be expected from the 35 percent commission West Brook was entitled to under the management agreement with petitioners. Because of this interest, Francis W. Wood was less likely to cause Dreamstreet to enforce its rights as a creditor against petitioners so as not to impair West Brook's earnings under the management agreement. In effect, respondent argues that Dreamstreet, West Brook, and Francis W. Wood constitute one and the same person or entity for purposes of section 465(b)(3)(A), and, therefore, there is an interest other than an interest as a creditor. The Court rejects this argument for several reasons. First, there is no provision to attribute the interests of Dreamstreet, West Brook, and Francis W. Wood as one and the same person or identity for purposes of section 465(b)(3)(A). Second, the record simply does not support a finding that the separate identities of Dreamstreet, West Brook, and Francis W. Wood should *663 be ignored or disregarded for purposes of section 465(b)(3)(A). The record satisfactorily establishes that all three maintained their separate identities and characteristics for tax purposes. Finally, even if the record would support a finding that Dreamstreet, West Brook, and Francis W. Wood were "one and the same," or even if specific authority existed in the law to attribute these three, the factual arrangement clearly did not establish that an interest existed other than an interest as a creditor. The management agreement held by West Brook was to run until December 31, 1988, which was also the maturity date of petitioners' notes. Until December 31, 1988, the only obligation of petitioners under the notes was to make the two early cash payments which Persson made. All payments of principal and interest up to December 31, 1988, were to be made from the net proceeds of semen sales, the promotion of which was the sole responsibility of West Brook. Petitioners, therefore, could not default on their notes prior to December 31, 1988. If petitioners were not in default, there obviously could be no enforcement rights which Dreamstreet could exercise as a creditor prior to December 31, 1988. *664 Consequently, on this record, a factual situation has not been shown to exist where at any time, prior to December 31, 1988, Dreamstreet's interest as a creditor would not likely be enforced because of the rights West Brook had under its maintenance agreements. Therefore, the Court finds that petitioners did not borrow the amounts owed from a person who held an interest other than an interest as a creditor under section 465(b)(3)(A). Respondent next contends that the amount borrowed from Dreamstreet by Wood was not at risk under section 465(b)(3)(B) because the amounts were borrowed from a person who had a relationship to Wood defined in section 267(b). Wood was the brother of Francis W. Wood. Francis W. Wood owned 100 percent of Dreamstreet and West Brook. Wood executed the note for his interest in Prophet to Dreamstreet. He, therefore, borrowed this amount from Dreamstreet. One of the relationships specified in section 267(b) is between "an individual and a corporation more than 50 percent in value of the outstanding stock of which is owned directly or indirectly by or for such individual." Section 267(b)(2). Under section 267(c)(2), an individual is considered as owning *665 the stock owned, directly or indirectly, by or for his family. Section 267(c)(4) provides that the "family" of an individual includes, among others, "brothers." It is apparent, therefore, that Wood borrowed the amounts represented by his note from a person having a relationship to him specified within one of the paragraphs of section 267(b). Wood, accordingly, was not at risk with respect to his indebtedness under section 465(b)(3)(B), and respondent is sustained as to this petitioner. The Court further finds that Wood did not establish that he made the cash payments due on his note, consequently, he contributed no money or other property for which he could be considered at risk under section 465(b)(1)(A). Wood, therefore, was not at risk under section 465 for any portion of his interest in Prophet. (8) Whether Petitioners Reported All Income Attributable To Their Interest In The Bull
By amendment to Answer, respondent contended, as a further alternative, that petitioners failed to report all gross income from semen sales, and, therefore, respondent alleged increased deficiencies and additions to tax. Respondent's amended Answer was based upon the stipulation of *666 the parties reflecting gross semen sales of $126,289.22 and $213,401, respectively, for 1982 and 1983. The amounts reported by petitioners on their returns did not reflect their proportionate amounts of these gross sales. The burden of proof with respect to the increased deficiencies and additions to tax is on respondent. Estate of Falese v. Commissioner,58 T.C. 895 (1972); Rule 142(a). Persson reported semen income of $14,000 and $19,103, respectively, on his 1982 and 1983 returns. His proportionate amount of gross semen sales, as stipulated by the parties, was $63,144.61 and $106,700.50, respectively, for each of the two years. Wood reported semen income of $4,667 on his 1982 return and his proportionate share of gross semen sales was $21,048.20. Wood's 1983 tax year is not at issue in this case. No evidence was presented at trial that respondent audited the books and records of either Dreamstreet or West Brook with regard to the expenses incurred in the management of Prophet or the income realized from semen sales. Under the Maintenance Agreement, West Brook, as part of its responsibilities, was required to pay all expenses for the care and management *667 of Prophet and to reimburse itself from semen sales, after which West Brook retained 35 percent of the net proceeds as compensation for its services. Petitioners testified that they received each year, either from Dreamstreet or West Brook, the necessary information for the reporting of income for their respective interests in Prophet. Respondent presented no evidence to establish that the amounts reported by petitioners were incorrect or that the difference between what each petitioner reported as income and the proportionate amount of gross semen sales did not constitute expenses for the care and maintenance of Prophet and the 35 percent commission payable to West Brook. On their returns, petitioners did not claim expenses for the care and management of Prophet nor did they claim the commissions for West Brook's services. It is evident to the Court, and so found, that these expenses were netted out by West Brook, and the income petitioners reported reflected a prior deduction of these expenses by West Brook. Respondent based its entire case on this issue on the cross examination of Francis W. Wood where he testified generally that these expenses may have been claimed as deductions *668 by either Dreamstreet or West Brook on their books and records. However, he qualified his testimony by stating that, when reimbursed, the reimbursements were recorded as income. No books and records were presented to corroborate this testimony, and the Court rejects respondent's argument that Francis W. Wood had ample time during the lengthy period of the trial of this case to produce the books and records to corroborate his testimony, which he failed to do. The burden of proof on this issue was on respondent, not petitioners. The Court finds, therefore, that petitioners correctly reported their share of semen income. (9) The Additions To Tax And The Increased Interest Rate
Respondent determined that petitioners were liable for additions to tax under sections 6653(a)(1), 6653(a)(2), and 6659, and for the increased rate of interest under section 6621(c), for each of the years at issue. Respondent also determined that Wood was liable for the addition to tax under section 6651(a)(1) for his 1981 taxable year. Section 6651(a)(1) provides for an addition to tax for failure to timely file returns. Taxpayers can avoid this addition by establishing either that the return *669 was timely filed or that it was filed late due to reasonable cause and not willful neglect. Section 301.6651-1(a)(1), Proced. & Admin. Regs. Wood's Federal income tax return for 1981 was filed October 26, 1984. The last date prescribed for filing his 1981 return was April 15, 1982. Section 6072(a). Wood presented no evidence that he had obtained an extension of time in which to file the return, or that he had reasonable cause for filing it late. Respondent, accordingly, is sustained on this adjustment. Sections 6653(a)(1) provides that "if any part of any underpayment * * * is due to negligence or intentional disregard of rules or regulations * * * there shall be added to the tax an amount equal to 5% of the underpayment." Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner,85 T.C. 934, 947 (1985); Barkley v. Commissioner,T.C. Memo. 1987-577. Section 6653(a)(2) provides for an addition to tax, in addition to the 5 percent penalty under section 6653(a)(1), of an amount equal to 50 percent of the interest on that portion of the underpayment *670 attributable to negligence. The Commissioner's determination is presumptively correct and will be upheld, unless the taxpayer is able to rebut the presumption by showing that he used due care. See Reily v. Commissioner,53 T.C. 8 (1969). The record shows that petitioners filed their returns claiming deductions and credits on an asset having a cost of $400,000 when the correct value of the asset was $175,000. At the time petitioners entered into the transaction, no effort was made to determine the true value of the bull which would support the deductions and credits claimed. An underpayment of taxes resulted from excess deductions and credits. On this record, the Court finds that such underpayments were attributable to negligence or intentional disregard of rules or regulations and accordingly sustains respondent on this issue. Section 6659 provides, as relevant here, for an addition to tax on underpayments attributable to valuation overstatements. Section 6659(c) defines valuation overstatements to include, inter alia, the claim on a return of an adjusted basis of 150 percent or more of the correct adjusted basis. Under section 6659(b), when the adjusted *671 basis claimed is more than 200 percent, but not more than 250 percent, of the correct adjusted basis, the addition to tax is 20 percent of the underpayment attributable to the valuation overstatement. Petitioners claimed deductions and credits on an asset they reported had a basis of $400,000. The Court finds that the correct basis for this asset was $175,000. Applying the mechanics of section 6659(c), 150 percent of the correct basis of the asset, $175,000, is $262,500. Since petitioners claimed tax benefits on a basis of $400,000, it is evident that the claimed basis exceeded the correct basis of the asset by 229 percent. Therefore, the underpayments in tax were attributable to a valuation overstatement, and the addition to tax under section 6659(b) applies at the rate of 20 percent of the underpayment attributable to the valuation overstatement. Respondent, therefore, is sustained on this adjustment. Section 6621(c), of the Internal Revenue Code of 1986, provides for an interest rate of 120 percent of the adjusted rate established under section 6621(b) if there is a "substantial underpayment" (an underpayment exceeding $1,000) in any taxable year *672 "attributable to one or more tax motivated transactions." Stanley Works v. Commissioner,87 T.C. 389 (1986). The increased rate applies to interest accrued after December 31, 1984, even though the transaction was entered into prior to the date of enactment of section 6621(c). Solowiejczyk v. Commissioner,85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986). Section 6621(c)(3)(A)(i) specifically includes in the definition of tax motivated transactions any valuation overstatement within the meaning of section 6659(c), and section 6621(c)(3)(A)(ii) includes any loss disallowed by reason of section 465(a). Given the fact that the Court finds that petitioners' underpayments were attributable to valuation overstatements, and petitioner Wood's losses were disallowed by reason of section 465(a), petitioners are liable for the increased interest under section 6621(c) in any year in which they had an underpayment in excess of $1,000. Respondent, therefore, is sustained on this adjustment. Decisions will be entered under Rule 155.
Footnotes
1. These cases were consolidated for purposes of trial, briefing, and opinion. ↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. 50 percent of the interest on the underpayment attributable to negligence or intentional disregard of rules or regulations.↩
3. Subsection (d) of section 6621↩ was redesignated subsection (c) by the Tax Reform Act of 1986, Pub. L. 99-514, section 1511(c)(1)(A)-(C), 100 Stat. 2744.
*. 50 percent of the interest on the underpayment attributable to negligence or intentional disregard of rules or regulations.↩
4. Since the issues are whether petitioners "purchased" a bull, and whether the transactions purporting to be a "sale" actually transferred the benefits and burdens of ownership to them, the Court throughout this opinion uses, as the parties have done on brief, terms such as "sale," "sold," "owned," "ownership," "purchase," "acquire," "investor," and other similar terms. Use of such terms is purely for convenience and does not constitute any legal conclusion as to the transactions described.↩